# Exhibit 1

 

November 10, 2015

**_Sent Via Federal Express_**

Chief Legal Officer
Harbor Freight Tools USA, Inc.
3491 Mission Oaks Boulevard
Camarillo, CA 93102-6010

Re: **www.harborfreight.com**, including Notice of Preservation Obligation

**FOR SETTLEMENT PURPOSES ONLY**

Dear Sir or Madam:

We represent disabled individuals throughout the United States who use the Internet to facilitate their access to goods and services. These individuals have disabilities that include: blindness and low vision, deafness and hearing loss, learning disabilities, cognitive limitations, mobility impairments, speech disabilities, photosensitivity and combinations of these. The United States Department of Justice ("DOJ") and various federal courts have concluded that businesses which offer goods and services to the public through websites are public accommodations that must comply with the general accessibility mandate of the Americans with Disabilities Act ("ADA").

Experts working with our clients, have identified access barriers on your website as follows:

**Section 508 Standards & W3C WCAG 2.0 Compliance Failures**

**URL:** www.harborfreight.com
**Date scanned:** October 29, 2015
**Sample size used in analysis:** 4295 files

**U.S. Accessibility Board - Section 508 Standards**

| Checkpoint | Checkpoint Title | # failed pages | % failed pages |
|---|---|---|---|
| a | Text equivalent for every non-text element. | 4,262 (of 4,295) | 99% |
| c | Information using color must be available without color. | 973 (of 4,295) | 23% |
| l | Provide equivalent text when using scripts. | 4,263 (of 4,295) | 99% |
| m | Provide a link for required applet, plug-in etc. | 3,507 (of 4,295) | 82% |
| n | Forms providing same information and functionality. | 3,508 (of 4,295) | 82% |

## Web Content Accessibility Guidelines (WCAG-2)

| Checkpoint | Level | Checkpoint Title | # failed pages | % failed pages |
|---|---|---|---|---|
| 1.1.1 | A | All non-text content (with certain exceptions) presented to the user should have an equivalent text alternative. | 4,262 (of 4,295) | 99% |
| 1.3.1 | A | Information about the meaning and structure of your content must be conveyed by more than the visual presentation of your content. | 4,263 (of 4,295) | 99% |
| 1.4.4 | AA | Except for captions and images of text, text can be resized without assistive technology up to 200 percent without loss of content or functionality. | 3,514 (of 4,295) | 82% |
| 2.2.1 | A | If the content enforces a time limit, the user should be able to extend, adjust or disable it, unless the time limit is part of a real time activity or would invalidate the activity. | 983 (of 4,295) | 23% |
| 2.4.2 | A | Web pages have titles that describe topic or purpose. | 755 (of 4,295) | 18% |
| 2.4.4 | A | The purpose of each link can be determined from the link text alone or from the link text and its programmatically determined link context, unless the purpose of the link would be ambiguous to users in general. | 3,566 (of 4,295) | 83% |
| 3.1.1 | A | The default human language of each Web page can be programmatically determined. | 755 (of 4,295) | 18% |
| 3.2.2 | A | Changing the setting of any user interface component doesn't automatically cause a change of context unless the user has been informed before using the component. | 2,719 (of 4,295) | 63% |
| 3.3.2 | A | Labels or instructions are provided when content requires user input. | 3,508 (of 4,295) | 82% |
| 4.1.1 | A | In content implemented using markup languages, elements have complete start and end tags, are nested according to their specifications, don't contain duplicate attributes, and any IDs are unique, except where the specifications allow these features. | 1,845 (of 4,295) | 43% |
| 4.1.2 | A | The name and role of all UI elements can be programmatically determined; things that can be set by the user can be programmatically set; and notification of changes to these items is available to user agents, including assistive technologies. | 3,528 (of 4,295) | 82% |

**Before you incur significant cost by engaging outside experts of your own, we invite you to first contact us directly to explore a far more cost-effective and pragmatic approach to resolving these issues.** We have already conducted a preliminary investigation working with prominent national experts and determined that your website has significant failures which limit accessibility for individuals with various disabilities. In addition, it is also our understanding that most (if not all) of the most reputable national experts are back-logged as a result of our clients' web accessibility efforts. This fact does not in any way prevent a resolution of our claims in the short term, as we will explain. In addition to limiting equal access to goods and services, these accessibility failures—and Harbor Freight Tools USA, Inc.'s data practices—limit or deprive our clients and other stakeholders of rights and opportunities that other visitors to **www.harborfreight.com** enjoy: access to privacy-related notices, opportunities to exercise privacy-related choices, and the ability to consent to legal terms and conditions to which Harbor Freight Tools USA, Inc. claims to bind visitors to its website.

This letter notes the accessibility failures on your website and the privacy and legal consequences of those failures, and proposes a plan to work constructively with you, on behalf of our clients and others similarly situated, to achieve equal accessibility for all disabled individuals who visit the site. In lieu of immediately filing a lawsuit in federal court, we are, in the first instance, proposing a collaborative approach that we have successfully utilized in this and other similar contexts to resolve claims for access to public accommodations by the disabled community. To this end, we urge you contact us within twenty-one (21) days of receipt of this letter.

I.      **ACCESSIBILITY FAILURES AND CONSEQUENCES**

The international website standards organization—the World Wide Web Consortium ("W3C")—has published Version 2.0 of the Web Content Accessibility Guidelines ("WCAG 2.0" or the "Guidelines"). The Guidelines have been endorsed by the DOJ. In addition, the United States Access Board has promulgated accessibility standards that apply to electronic and information technology procured by the federal government (the "Section 508 Standards"). Together, the Guidelines and the Section 508 Standards are universally recognized as setting the baseline requirements for website accessibility and have been used by the DOJ as a benchmark in settling website accessibility matters.

Our investigation reveals that your websites, **www.harborfreight.com**, has substantial access barriers. As a consequence of these failures, it is difficult or impossible for our clients and similarly situated stakeholders to access the site's privacy-related information and legal terms and conditions, and to exercise privacy and legal choices available to persons who enjoy full access to the website. These consequences are material to our clients and similarly situated stakeholders, particularly in light of the results of our evaluation of privacy-related and legal disclosures on the website, and our technical investigation of data collection practices.

3

II. **COUNSEL**

Carlson Lynch Sweet & Kilpela ("CLSK") is a full-service civil law firm, with extensive national experience litigating disability cases. KamberLaw is the leading law firm in the prosecution of Internet privacy violations, and federal courts have acknowledged the firm's "recognized experience in complex litigation involving technology and privacy issues." Recently, CLSK and KamberLaw have sought permanent injunctive relief for pervasive accessibility and privacy failures in the following federal actions involving digital access:

*Guimaraes v. National Collegiate Athletic Association,* Case No. 15-cv-13378 (D. Mass.);

*Jahoda v. National Basketball Association,* Case. No. 15-cv-01462-AJS (W.D. Penn);

*Gross et al. v. Ascena Retail Group,* Case No. 15-cv-01214-AJS (W.D. Penn.);

*Parrish v. Sears Holdings Corporation,* Case No. 3:15-cv-05622 (W.D. Wash.) (setting forth ADA and privacy claims);

*Sipe v. Toys "R" Us, Inc.,* Case No. 15-cv-1037-AJS (W.D. Penn.) (setting forth ADA and privacy claims);

*Jahoda v. Foot Locker, Inc.,* Case No. 15-cv-1000-AJS (W.D. Penn.);

*Jahoda v. Brooks Brothers, Inc.,* Case No. 15-cv-1050-AJS (W.D. Penn.);

*Sipe v. Huntington National Bank,* Case No. 15-cv-1083-AJS (W.D. Penn.);

*Jahoda v. The Pep Boys – Manny, Moe & Jack,* Case No. 15-cv-1124-AJS (W.D. Penn.);

*Jahoda v. Hard Rock Cafe International, Inc.,* Case No. 15-cv-1123-AJS (W.D. Penn.);

*Gross et al. v. V.F. Corporation,* Case No. 2:15-cv-011772-AJS (W.D. Pa);

III. **LEGAL BASIS OF THE CLAIMS**

The DOJ has emphasized the need for accessible electronic and information technology—including websites—for disabled individuals.[1] The DOJ issued an Advance Notice of Proposed Rulemaking regarding revising the regulations implementing Title III of the ADA in order to establish specific scoping requirements for making goods, services, facilities, privileges, accom-

---

[1] *See, e.g., New v. Lucky Brand Dungarees Stores, Inc.,* Statement of Interest of the United States, Case No. 14-CV-20574 (S.D. Fla.) ("the Department has long considered websites to be covered by Title III despite the fact that there are no specific technical requirements for websites currently in the regulations or ADA standards"); *see also* Statement of Interest of the United States, *Nat'l Assoc. of the Deaf v. Netflix Inc.,* 869 F. Supp. 2d 196 (D. Mass 2012), available at http://www.ada.gov/briefs/netflix_SOI.pdf (discussing history of public DOJ pronouncements on the topic); *see also* Consent Decree, *Nat'l Fed of the Blind, et al., United States of America v. HRB Digital LLC and HRB Tax Group, Inc.,* No. 1:13-cv-10799-GAO (entered March 25, 2014), available at http://www.ada.gov/hrb-cd.htm (comprehensive decree governing accessibility of H&R Block's website).

4

modation, or advantages offered by public accommodations via the Internet accessible to individuals with disabilities. The comment period has been extended through July 2016. [2,3]

Title III of the ADA imposes a general accessibility mandate upon Harbor Freight Tools USA, Inc.

insofar as it provides that "no individual shall be discriminated against on the basis of disabilities in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation...."[4] "[T]he statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on websites over the Internet."[5] Congress unambiguously declared that it is discriminatory both to deny the equal opportunity to participate in a service and to provide services in a way that does not provide equal benefit.[6]

Coupled with this general obligation, Title III imposes specific obligations upon Harbor Freight Tools USA, Inc. to ensure effective communication with its patrons. Specifically, Harbor Freight Tools USA, Inc. is required to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."[7] The regulations implementing the ADA set forth numerous examples of appropriate auxiliary aids and services, including Brailed materials and displays, screen reader software, accessibility electronic and information technology, and other means of making electronic information available to individu-

---

[2] Specifically, the DOJ expressed "[t]he ADA's promise to provide an equal opportunity for the individuals with disabilities to participate in and benefit from all aspects of American civic and economic life will be achieved in today's technologically advanced society only if it is clear to State and local governments, businesses, educators, and other public accommodations that their websites must be accessible." See Nondiscrimination on the Basic of Disability; accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, available at http://www.ada.gov/anprm2010/web%20anprm_2010.htm (emphasis added).

[3] On June 5, 2014 the DOJ announced it had settled website accessibility claims with Florida State University. See Justice Department Reaches Settlement with Florida State University, available at http://www.justice.gov/opa/pr/2014/June/14-crt-606.html. Under the settlement, FSU agreed to make its website and mobile applications conform to the WCAG 2.0 AA Guidelines, at a minimum.

[4] 42 U.S.C. § 12812(a).

[5] See Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodation, available at http://www.ada.gov/anprm2010/web%20anprm_2010.htm.

[6] 42 U.S.C. § 12182(b)(1)(A)(i)-(ii).

[7] 28 C.F.R. § 36.303(c); see also 42 U.S.C. 12182(b)(2)(A)(iii) ("[D]iscrimination includes…a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently that other individuals because of the absence of auxiliary aids and services").

als with the types of disabilities listed in this letter.[8] Failure of your website to support these and other assistive technologies is a violation of the ADA and the Section 508 requirements.

Federal courts have endorsed the DOJ's interpretation of the ADA in the context of web accessibility. *See, e.g.*, *National Federation of the Blind v. Target Corporation*, 452 F.Supp.2d 946 (N.D. Cal. 2006) (denying motion to dismiss); 582 F.Supp.2d 1185 (granting motion for class certification); *National Federation of the Blind v. Scribd, Inc.*, 2015 WL 1263336 (D. Vt. Mar. 19, 2015) (denying motion to dismiss); *National Association of the Deaf v. Netflix*, 869 F.Supp.2d 196 (D. Mass. 2012) (denying motion for judgment on the pleadings). Thus, there is little doubt that the Title III accessibility requirements apply to websites. *Cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).

Numerous state laws protect consumers' privacy rights affected by their dealings with websites. These laws include "baby UDAP" statutes modeled on the Federal Trade Commission Act, which prohibit unfair and deceptive acts and practices. These laws are implicated by conduct such as described above in Section II, especially where a website that purports to offer privacy notice and choice does not extend them to the individuals such as those we represent. Such conduct deprives our clients of opportunities enjoyed by other classes of persons to control how their information is collected, how they are profiled and how information about them is retained and used. In addition, California law prescribes certain standards for the availability and conspicuousness of disclosures related to the collection and use of personally identifiable information.

In addition, to the extent consumers' personal information is collected without the benefit of their ability to receive notice and exercise choice, and subsequently used to contact them by e-mail or telephone, such conduct implicates the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, and the CAN-SPAM Act, 15 U.S.C. § 7701, *et seq.*, and their implementing regulations.

State laws also prohibit computer tampering, which has been construed to include unauthorized storage of tracking information on consumers' computers and implementation of website code that circumvents consumers' computer privacy settings. Such laws would also be implicated by conduct that diminishes or disables the utility of disabled consumers' accessibility tools.

Should this matter be litigated, then, in addition to seeking final remedies on behalf of our clients, we would seek the following declaratory judgments:

- A "reasonably prudent user" or "consumer acting reasonably under the circumstances" objectively includes persons with disabilities who use assistive technologies and devices such as those described above, in characterizing our clients.

- Our clients shall not bound by any term or condition, or deemed to have received any notice, in any purported communication or "browsewrap" agreement that was not rea-

---

[8] 28 C.F.R § 36.303(b)(2).

6

- sonably accessibility before our clients sustained the harms alleged above. *See Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (for contract allegedly entered into merely by use of website, validity is contingent on evidence of actual or constructive notice); *see also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30-31(2d Cir. 2002); *Small Justice LLC, et al. v. Xcentric Ventures LLC*, No. 13-cv-11701 (D. Mass. Mar. 27, 2015); *see also Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009) (defining browsewrap agreement as one to which party assents merely by use of website, without affirmatively assenting to terms and conditions).

- Our clients shall not bound by any term or condition in any purported "clickwrap" agreement to which assent is ambiguous in the context of the website content and assent mechanism in interactions with assistive devices described above. *Cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).[9]

## IV. PROPOSAL FOR RESOLUTION AND REMEDIAL MEASURES

In lieu of formal litigation, we propose that the parties engage in settlement negotiations on an expedited basis, with the goal of achieving an enforceable settlement agreement providing for injunctive relief, and reasonable attorney's fee and costs. We would be willing to pursue these negotiations either directly or with the assistance of a mutually acceptable mediator.

The remedial measures would include, at a minimum, the following:

- Designate one or more individuals to manage web accessibility testing, repairing, implementing, maintaining and reporting for a Section 508 and WCAG 2.0 compliant website within a reasonable time period.

---

[9] In light of these concerns, this letter confirms your obligation to locate and preserve any and all documents, data, and tangible things potentially relevant to the matters raised in this letter and your potential defenses, whether in your possession or the possession of third parties and subject to your control, and including but not limited to: computer code, instructions, and documentation; documents relating to third-party developers, affiliates, and data partners; and records of consumer consent to data collection, use, and retention; and including metadata associated with documents.

Your obligation extends to personal information from and about our clients; documents relating to third-party recipients and providers of such information, including agreements and correspondence relating to your relationships with those third parties; and server and application log files created in the course of transactions in which such information was collected from our clients or transmitted to or from third parties.

We also note that your obligation to locate and preserve documents extends to documents relating to actual or attempted detection or determination of identities, disability statuses, or use of accessibility technology and devices of visitors to your website, and including where such efforts involved device or browser fingerprinting in website interactions with consumers; other website code; analytics; or information obtained from or provided to third parties.

- Create, adopt and maintain a web accessibility policy consistent with prevailing standards.

- Initiate a needs assessment and subsequent training for web and content development personnel on Section 508 and WCAG 2.0 accessibility programming, functionality and design

- Contractually require that services procured and performed by third-party developers and other relevant service providers conform to prevailing Section 508 and WCAG 2.0 compliant accessibility standards and your web accessibility policy.

- Conduct independent third-party monthly automated and disabled end-user testing of web site.

- Implement other related policy, technology and programming, monitoring and training measures as they are identified and needed.

Enclosed please find a draft Settlement Agreement for your review and consideration.

You may reach Benjamin J. Sweet or Scott Kamber to discuss this matter by contacting their legal assistant Jessica Davis at jdavis@carlsonlynch.com.

This letter is a confidential settlement communication and cannot be used in any action before any court. The statements of either party in these settlement negotiations cannot be considered admissions nor are they binding upon parties if no settlement is reached.

We hope that you will share our view concerning the value of a collaborative approach in expeditiously resolving these accessibility issues.

We look forward to your quick response.

_____
R. Bruce Carlson, Esq.
CARLSON LYNCH SWEET
& KILPELA LLP

_____
Benjamin J. Sweet, Esq.
CARLSON LYNCH SWEET
& KILPELA LLP

_____
Scott A. Kamber, Esq.
KAMBERLAW, LLC

DRAFT

## SETTLEMENT AGREEMENT

### BACKGROUND

1. The parties to this Settlement Agreement ("Agreement") are PLAINTIFF ("Plaintiff") and DEFENDANT ("Defendant").

2. Defendant owns and operates WEBSITE (the "Website") or controls and causes WEBSITE to be operated on Defendant's behalf, and which Defendant makes available to members of the public to access with personal computers, laptops, mobile devices tablets, and other Internet-connected devices. On and through WEBSITE, Defendant offers products and services for online use, sale and home delivery, and related information. Services on Defendant's Website include functions to help users locate Defendant's retail stores, obtain product and pricing information, and a variety of other functions related to Defendant's retail offerings.

3. Despite several attempts to use and navigate WEBSITE, Plaintiff has been unable to access goods, services and information that Defendant offers on and through WEBSITE.

4. Following a compliance review by counsel for Plaintiff and web accessibility experts retained on Plaintiff's behalf, Plaintiff has determined that WEBSITE is not fully accessible to individuals with disabilities, in violation of Title III of the ADA.

5. DEFENDANT disputes the determination set forth above and denies that WEBSITE is in violation of Title III of the ADA.

6. Under this Agreement, DEFENDANT has agreed to make modifications to WEBSITE, and take certain other actions, calculated to increase the accessibility of WEBSITE for end-users with disabilities accessing the WEBSITE through the use of personal computers, laptops, mobile devices tablets, and other similar devices.

DRAFT

7. Title III of the ADA, 42 U.S.C. §§ 12181-12189, and regulations implementing Title III, 28 C.F.R. pt. 36, prohibit discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation by any private entity that owns, leases (or leases to), or operates any place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a); *see also* 42 U.S.C. §§ 12181(7), 28 C.F.R. §§ 36.104.

## AGREED RESOLUTION

8. The parties agree that it is in their best interests to voluntarily enter into this Agreement. The parties have therefore agreed as follows:

9. <u>Consideration</u>. In consideration of the mutual promises, covenants and undertakings set forth below, Plaintiff and Defendant, intending to be legally bound, agree to the following terms and conditions to forever resolve, settle and discharge the Released Claims (as defined below).

10. <u>Release of Plaintiff's Claims</u>. For and in consideration of the promises, commitments and undertakings set forth in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, Plaintiff, on behalf of himself and any of his agents, employees, representatives, assigns, heirs, executors, trustees, partners and attorneys, and each of them (the "Releasing Persons"), shall be deemed to have jointly and severally forever released and discharged Defendant, together with its past, present, and future officers, directors, employees, agents, stockholders, attorneys, servants, representatives, parent entities, subsidiary entities, affiliate entities, partners, insurers, and to the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing, (collectively, the "Released Parties"), from any and all claims, causes of action, suits, demands, rights,

2

DRAFT

liabilities, damages, lawsuits, losses, fees, costs or expenses of any kind whatsoever, whether known or unknown, including any monetary, injunctive or declaratory relief relating thereto, or for reimbursement of attorney's fees, costs and expenses, relating to the Action, but not including claims related to the enforcement of this Agreement. This release expressly applies to all claims regarding the accessibility of WEBSITE, including but not limited to all claims arising from or relating to the ADA, any federal, state, or local law, statute or ordinance, rule or principle of common law or doctrine in law or equity, known or unknown, suspected or unsuspected, foreseen or unforeseen, real or imaginary, actual or potential, through the date of this Agreement (the "Released Claims"). Plaintiff, on his own behalf and on behalf of the Releasing Persons, acknowledges that Released Claims may include claims that are presently unknown, and that the release contained in this Agreement is intended to and does fully, finally and forever discharge all Released Claims, whether now asserted or unasserted, known or unknown, which arise out of or in connection with Plaintiff's claims set forth in paragraphs 2 through 4, above.

11. <u>Payment of Certain Attorney's Fees and Expenses</u>. Defendant has agreed to pay certain attorney's fees and expenses in the amount and in accordance with the terms memorialized in a separate, confidential letter agreement dated as of DATE.

**ACTIONS TO BE TAKEN BY DEFENDANT**

12. DEFENDANT shall ensure full and equal enjoyment of its goods, services, facilities, privileges, advantages, and accommodations provided through WEBSITE, as follows:

**Website Accessibility Conformance for DEFENDANT:**

13. <u>Website Deadline</u>: Within eighteen (18) months after the Effective Date of this Agreement, DEFENDANT shall:

3

DRAFT

a. Ensure that WEBSITE conforms with, at minimum, U.S. Section 508 Standards published by the U.S. Access Board and the Web Content Accessibility Guidelines ("WCAG") 2.0 AA, published by the Web Content Accessibility Initiative of the World Wide Web Consortium ("W3C"); and,

b. Adopt and implement a Website Accessibility Policy requiring that any changes or additions to WEBSITE do not cause the Site to fall out of conformance with, at minimum, Section 508 and WCAG 2.0 AA.

c. Ensure that WEBSITE conformance extends to providing users with all disclosures, notices, and choices relating to user privacy and security as are available to non-disabled persons; and that DEFENDANT's changes to any privacy or security-related notices on WEBSITE, to its terms of use, and any other legal notices are advertised to users in a clear and conspicuous manner reasonably in advance of such changes without shifting the burden to users to periodically access and review such notices to attempt to determine what changes have been made.

**<u>Website Accessibility Consultant:</u>**

14. Within thirty (30) days after the Effective Date of this Agreement, DEFENDANT shall retain one or more independent consultants ("Website Accessibility Consultant"), approved in advance by PLAINTIFF, who is possesses expert knowledge about accessible website design and development, Title III of the ADA, Section 508 and WCAG 2.0 AA. The Website Accessibility Consultant will assist DEFENDANT in meeting the requirements of this Agreement and shall be responsible for the initial Section 508 and WCAG 2.0 Website Accessibility Evaluation and subsequent Website Accessibility Evaluations (Paragraphs 16-17).

DRAFT

**Website Accessibility Evaluation:**

15. Within six (6) months after the Effective Date of this Agreement (the "Initial Website Accessibility Evaluation Deadline"), the independent Website Accessibility Consultant shall provide the parties a written evaluation ("Website Accessibility Evaluation") concerning the conformance of the website to U.S. Section 508 standards and WCAG 2.0 AA checkpoints by performing automated accessibility tests, using an automated tool preapproved by the attorneys to identify any accessibility barriers; enlisting end-users with different disabilities (utilizing a variety of assistive technologies) including at a minimum individuals who are blind, who have low vision and who have fine motor disabilities (such as those limiting the ability to use a mouse), to test WEBSITE pages for accessibility barriers. The evaluation shall: (a) identify all issues that cause the WEBSITE to be out of conformance with Section 508 and WCAG 2.0 AA; and (b) make recommendations to bring the WEBSITE into conformance with Section 508 and WCAG 2.0 AA. The Website Accessibility Evaluation shall be shared with counsel for Plaintiff. To the extent that counsel for Plaintiff take issue with information set forth in the Website Accessibility Evaluation, they shall meet and confer in good faith with counsel for DEFENDANT and the Website Accessibility Consultant to address all issues. DEFENDANT shall address the recommendations contained in the Website Accessibility Evaluation, working with the Website Accessibility Consultant (selected with the approval of counsel for Plaintiff), and remedy all areas of non-conformance with Section 508 and WCAG 2.0 AA no later than the Website Deadline (Defined at Paragraph 13).

5

DRAFT

**Training:**

16.     Within one hundred eighty (180) days after the Effective Date of this Agreement, and on subsequent anniversaries of the Effective Date, DEFENDANT shall provide both ELearning based and on-site training to DEFENDANT IT Management, Website Developers and Content Personnel and Website Technical Support Personnel on how to conform and maintain WEBSITE to, at minimum, Section 508 and WCAG 2.0 AA and the terms of this Agreement. The Website Accessibility Consultant shall provide DEFENDANT with this training.  All training materials shall be shared with counsel for Plaintiff.  To the extent that counsel for Plaintiff take issue with any of the training materials, they shall meet and confer in good faith with counsel for Defendant and the Website Accessibility Consultant to address any issues.

17.     On either a monthly, quarterly or annual basis,(frequency will be based on complexity of the WEBSITE and frequency of WEBSITE updates) after the initial Audit Deadline (no later than each anniversary of the Initial Audit Deadline), the independent Website Accessibility Consultant shall provide the parties with a Website Accessibility Evaluation concerning conformance of WEBSITE with, at a minimum, Section 508 and WCAG 2.0 AA. The evaluation shall: (a) identify all issues that cause the WEBSITE to be out of conformance with Section 508 and WCAG 2.0 AA; and (b) make recommendations which will bring the WEBSITE into conformance with Section 508 and WCAG 2.0 AA.    To the extent that counsel for Plaintiff takes issue with anything set forth in the Website Accessibility Evaluation, they shall meet and confer in good faith with counsel for Defendant and the Website Accessibility Consultant to address any issues. DEFENDANT shall address the recommendations contained in the Website Accessibility Evaluation and remedy any areas of non-conformance with Section

DRAFT

508 and WCAG 2.0 AA within thirty (30) days of receiving the Website Accessibility Evaluation and report its actions to counsel for Plaintiff.

18.   It is understood that counsel for Plaintiff have the right to perform their own automated testing, and testing by end-users with disabilities, to confirm compliance with Section 508 and WCAG 2.0 AA during the term of this agreement.

## MISCELLANEOUS PROVISIONS

19.   To the extent any actions taken by or on behalf of DEFENDANT must be taken by a third party providing website development, hosting or other related services to DEFENDANT, DEFENDANT hereby assigns to PLAINTIFF any indemnification rights held by DEFENDANT as to such third party.

20.   If Plaintiff believes that this Agreement or any portion of it has been violated, Plaintiff shall give notice (including reasonable particulars) of such violation to DEFENDANT. Defendant must respond to such notice as soon as practicable but no later than thirty (30) days thereafter. Plaintiff and DEFENDANT shall negotiate in good faith in an attempt to resolve any dispute relating thereto; if the parties are unable to reach a mutually acceptable resolution, Plaintiff may seek court enforcement of compliance with this Agreement or take other action to enforce Title III of the ADA.

21.   This Agreement shall become effective as of the date of the last signature below ("Effective Date") and shall remain in effect for five (5) years from that date.

22.   If the United States Department of Justice promulgates a final ADA Title III regulation setting out a website accessibility technical standard during the term of this Agreement, then the Parties shall meet and confer at the request of either party to discuss

DRAFT

whether modification to the terms of this Agreement regarding the technical standard is necessary to be consistent with the final regulation and shall modify this Agreement accordingly.

23. This Agreement does not purport to remedy any violations or potential violations of the ADA or any federal or state law, other than those regulating to the accessibility of WEBSITE to individuals with disabilities.

24. This Agreement shall be binding on: DEFENDANT, its employees, contractors and agents. In the event that DEFENDANT seeks to transfer or assign all or part of its interest in any service covered by this Agreement, and the successor or assign intends on carrying on the same or similar use of WEBSITE, then as a condition of sale, DEFENDANT shall obtain the written accession of the successor or assign to any obligations remaining under this Agreement for the remaining term of this Agreement.

25. The requirements of this Agreement shall be binding on DEFENDANT regardless of whether any change in law or regulation subsequently articulates a standard of conduct that may authorize a lesser degree of accessibility; but nothing in this Agreement shall be deemed to authorize or excuse any conduct that does not comply with a higher standard of conduct required by law or regulation.

26. The signatories represent that they have the authority to bind the respective parties identified below to the terms of this Agreement.

27. <u>Confidentiality</u>. Plaintiff, for himself and his Counsel, agents and representatives, and Defendant, its Counsel, agents and representatives, agree that, they will not without the prior written consent of the other Party communicate, publish, display, discuss, disclose, reveal or characterize (directly or indirectly by innuendo or other means) in any way to anyone under any circumstances (i) the terms of this Agreement, (ii) the substance of negotiations leading up to this

DRAFT

Agreement, and (iii) the circumstances concerning any dispute between the Parties related to Plaintiff's claims set forth herein, except (a) as may be required by order of Court or demand of any other quasi-judicial, regulatory or investigative organization with the legal right and power to demand such information, provided that the Party in receipt of such order or demand shall promptly notify the other Party hereto, who may elect to oppose or move to quash disclosure, (b) to Plaintiff's or Defendant's legal and financial advisors, in each case where such disclosure may be required for legitimate legal, business or tax purposes and where the recipient of such information agrees to receive and maintain the information in strict confidence in accordance with the terms of this Agreement, (c) to any appropriate regulatory or tax authorities with jurisdiction over Plaintiff or Defendant, and (d) as otherwise may be required by law. Prohibited disclosure hereunder shall include, without limitation, the making of any statement, written or oral, to any person through any medium, including (without limitation) newspaper, magazine, radio, television or electronic media (such as internet website, chat room, instant messaging or any other similar medium). If Plaintiff or Defendant, or their respective Counsel, agents or representatives receive an unsolicited inquiry about this Agreement, any disputed matter, any released claims, or any other matter subject to the confidentiality and non-disclosure provisions of this Agreement, such Party will respond only that "the matter has been amicably resolved." Further, Plaintiff and Defendant and their respective Counsel, agents and representatives, agree not to make any disparaging remarks about the other Party relating to (i) this Agreement, or (ii) the services or practices of Defendant related to the subject matter of this Agreement. If any Party shall be in material breach of the obligations in respect of the confidentiality and non-disclosure provisions of this Agreement, the non-breaching Party shall be entitled to, in addition to other remedies, temporary and permanent injunctions restraining such breach, and to a decree

DRAFT

for specific performance of this provision. The Parties further agree that non-breaching Party shall be entitled to recover from the breaching Party its attorneys' fees and costs expended in any action or proceeding to enforce this Paragraph of this Settlement Agreement.

28. <u>Counterparts Permissible</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original against the Party whose signature is provided, and all of which shall be considered an original and together shall constitute one agreement binding on all Parties. An electronic or digital copy of an original shall be deemed to be as valid and enforceable as original ink signatures.

29. <u>Ongoing Cooperation</u>. The Parties agree to execute all such further and additional documents and instruments, as shall be necessary or expedient to carry out the provisions of this Agreement, and shall promptly and in good faith undertake all reasonable acts to effectuate the provisions of this Agreement.

30. <u>Notices</u>. All letters, notices, requests, demands and other communication required or permitted to be given to the Parties pursuant to this Agreement shall be in writing, provided by electronic mail, facsimile and/or next-day (excluding Saturday and Sunday) express delivery service and addressed as follows:

DRAFT

| For Plaintiff: | Scott A. Kamber, Esq.<br>David A. Stampley, Esq.<br>KAMBERLAW, LLC<br>100 Wall Street, 23rd floor<br>New York, NY 10005<br>Phone: 1.212.920.3072<br>Fax: 1.212.202.6364 |
| --- | --- |
| | R. Bruce Carlson, Esq.<br>Benjamin J. Sweet, Esq.<br>Carlson Lynch Sweet & Kilpela LLP<br>1133 Penn Avenue<br>5th Floor<br>Pittsburgh, PA 15222<br>Email: bcarlson@carlsonlynch.com<br>Email: bsweet@carlsonlynch.com<br>Phone: 412-322-9243<br>Fax: 412-231-0246 |

AGREED AND CONSENTED TO:

DATED: